## Case No. 17,093.

### WALL v. The ROYAL SAXON.

[2 Am. Law Reg. 324; 5 Pa. Law J. Rep. 290.]

District Court, E. D. Pennsylvania. Feb. 4, 1848.

ADMIRALTY JURISDICTION — LIEN FOR WAGES — VESSEL IN CUSTODY OF STATE COURT—SALE.

A vessel may be libelled and sold in a court of admiralty, under a paramount lien, such as for seamen's wages, notwithstanding that she has been previously seized by process of foreign attachment issuing out of a state court, and still remains in the custody of the sheriff; and a perfect title will pass to the marshal's vendee.

[Cited in Ashbrook v. The Golden Gate, Case No. 574; Marsh v. The Minnie, Id. 9,117. Questioned in The N. W. Thomas, Id. 10,-386. Quoted in The Isabella, Id. 7,100. Cited in The E. A. Barnard, 2 Fed. 722.]

[Disapproved in Keating v. Spink, 3 Ohio. St. 121.]

Libel in admiralty in a cause of wages. Petition for an interlocutory order of sale.

KANE, District Judge. The British barque, Royal Saxon, being under attachment in the admiralty, for mariners' wages and supplies; the master, with the approval of the consul of his nation, has applied to the court for an interlocutory order of sale. The facts, as reported by the commissioner, show that such an order is called for by the interests of all parties, and that according to the ordinary course of the admiralty, it should be granted without delay.

The application is resisted by third persons, suitors in one of the courts of Pennsylvania, at whose instance the vessel was attached under mesne process against certain non-resident defendants, before she was arrested by the marshal. They have presented two questions for the consideration of this court: (1) Whether, pending such attachment from the state court, the vessel was liable to arrest, and is now liable to interlocutory order in the admiralty; (2) whether, admitting such liability to exist, this court

ought under the circumstances to enforce it. I shall consider the questions together; for they resolve themselves into one.

The authority of the courts of admiralty to make seizure and sale of vessels, while under attachment from the courts of common law, has not hitherto been questioned in England or this country. On the contrary, it has been exercised in England, without prohibition or dispute; and in the courts of the United States, it has been asserted, and acted on, as often as occasion has offered. The cases of The Flora, 1 Hagg. Adm. 298; The Spartan [Case No. 4,085], and of Certain Logs of Mahogany [Id. 2,559], are illustrations of this.

The case in Haggard is interesting, as it shows at least the tacit recognition of this admiralty power by the common law courts. An execution had been levied on the ship from the king's bench, before the attachment from the admiralty. A sale was had under an admiralty decree, and the proceeds were brought in and distributed, so far as the claimants in that court had right. The question then arose, to whom should the surplus proceeds be paid over. The sheriff applied to the king's bench for a rule on the marshal to pay them over to him; but was refused, on the ground that the marshal had acted under competent authority, and that he would not be bound to obey if ruled. The judgment creditor and the defendant in execution thereupon applied severally to the admiralty, each claiming the surplus. A decretal order pro forma was made in favor of the defendant; and thereupon the whole matter was carried up by appeal to the court of delegates, comprising judges of the king's bench, common pleas and exchequer, as well as those of the civil law courts. It was admitted in argument before the delegates, that the sheriff's possession was suspended by the admiralty process;—but on the ground, as it would seem, that, though suspended, it was not abandoned, and that the sheriff's rights still continued as against the owner, the court directed that the surplus proceeds remaining in the admiralty, after satisfying the claims in that court, should be paid to the sheriff: and the decision thus given was satisfactory to Lord Eldon, who, as chancellor, refused a commission of review. In this whole case there does not appear, either on the arguments of counsel or the judgments rendered by the several courts, the suggestion of a doubt as to the regularity of the proceedings of attachment and sale in the admiralty, though both followed the sheriff's levy.

The case of the Spartan presented the question under circumstances almost identical with the case before me. The vessel had been attached in the state court of Maine by sundry creditors, before the libel in the admiralty, which was for wages, as in our case. The master, by his answer, admitted the wages to be due; but the right of the libel-

lants to proceed was resisted by the sheriff, on behalf of the attaching creditors. The court maintained the regularity of the proceeding in admiralty. "The property," said Judge Ware, whose accuracy of learning makes him a safe guide, "the property has been attached by sundry creditors of the charterers, and the cases are now pending in the state courts. It is argued, that as different creditors are each pursuing their own right against this property in different courts, it is a proper rule, to prevent collision of judicial authority, to give precedence to those who first lay their hands on the fund. This priority might be decisive, if both creditors stood in the same relation to this specific property. But the reason no longer holds, when the claim of one of the parties is in its nature a privileged claim. The very essence of a privilege is to give the creditor a preference over the general creditors of the debtor; and if such be the claim of the seamen, the attachment only created a lien on the property, subject to such prior incumbrance. It can only extend to the whole right to the owner; and that was, to hold the property after discharging the lien."

The same law is asserted by Judge Story, in the case Certain Logs of Mahogany [supra]. It was that of a replevin from a state court, issued and served before the marshal's attachment in rem. "A suit in a state court," said Judge Story, "by replevin, or by an attachment under process, of the property, can never be admitted to supersede the right of a court of admiralty to proceed by a suit in rem to enforce a right against that property, to whomsoever it may belong. The admiralty suit does not attempt to enter into any conflict with the state court, as to the just operation of its process; but it merely asserts a paramount right against all persons whatever, whether claiming above or under that process. No doubt can exist, that a ship may be seized under admiralty process for a forfeiture, notwithstanding a prior replevin or attachment of the ship then pending. The same thing is true as to the lien on a ship for seamen's wages, or on a bottomry bond."

These cases leave me without any doubt as to what the law is, or what are the grounds on which it rests. The proceeding in the courts of the state applies itself to alleged interests in the vessel, not to the vessel itself. The plaintiff in replevin recovers his property, whatever it may be; but no more: his title is not disencumbered by the execution which follows on his judgment. The attachment creditor, if he succeeds in his suit, obtains recourse against the thing attached, just so far as his defendant had interest in it, and no farther. The rights of third parties remain in both cases unaffected. The bona fide owner of the property may sue out his process, and recover the possession against the sheriff's vendee, as if no replevin or attachment had issued. The bottomry creditor, residing, it may be, in a foreign

country, is no party to either proceeding, and loses none of his rights; his contract was with the thing, not the owner, and it is, therefore, not embarrassed, and cannot be, by any question or contest of ownership. So, too, the seamen: whoever owns the vessel, or how often soever the ownership may be changed; wherever she may go, whatever may befal her; so long as a plank remains of her hull, the seamen are her first creditors, and she is privileged to them for their wages. It is the interest of the individual defendant, his residuary interest after all these are satisfied, upon which alone the common law process operates.

Nor would the case be different if the sheriff's sale had been made under an interlocutory order. I am not aware that a court of common law can adjudicate upon rights that are not before it, or that the sheriff can sell what never passed into his custody. What rights were, or could be, involved in the proceeding by foreign attachment?—those of the defendant in the writ; surely none else: the command of the writ was to "attach the goods and effects of the defendant" only. And what was it that passed into the sheriff's keeping? The act of assembly of Pennsylvania tells us that it was "the goods and effects of the defendant, susceptible of seizure and manual occupation," and nothing more. See Act 1836, § 50. How, then, could the sheriff take or sell the title of a third person?

Should a foreigner present himself to-morrow, or a year hence, in the state court, and show there that from the first, and at all times, he had been and was the only owner of the Royal Saxon, and that the defendant, as whose property she was attached, never had a scintilla of interest in her, would that court refuse to him its judgment in replevin? "I was no party," he would say, "to the proceeding under which my ship was sold; I had no notice of it; neither my title, nor any liability of mine, or of my property, was asserted to be in issue; the whole controversy was between strangers." And if the sheriff's vendee, in reply, were to assert his title under the judicial sale, would he not be told at once, in the language of the supreme court of Pennsylvania, in Freeman v. Caldwell, 10 Watts, 9: "In judicial sales there is no warranty, whether the sale be of land or of a chattel pure. What interest in it does the sheriff propose to sell? Not a title to it; but the defendant's property in it, whatever it may be."

Not so in the admiralty. Here, the subject matter of the controversy is the res itself. It passes into the custody of the court. All the world are parties; and the decree concludes all outstanding interests, because all are represented. Here, they are marshaled in their order of title or privilege; and if there be conflicting claims either upon the distributable fund, or upon the residue, the court adjudicates between them, or refers the question

to that forum, either at home, or in foreign countries, which is most competent to examine it. It is an international court: its seal is recognized every where; and its decrees are executed wherever, throughout the world, there is a court of admiralty to appeal to. Its forms of proceeding are known among all maritime nations, and the title which passes under them is absolute, without conditions, discharged of all liabilities and liens. See the Thomas [Case No. 14,206].

There is, therefore, as it seems to me, no difficulty in allowing an arrest by the admiralty, notwithstanding the vessel, or some interest in it, has passed before into the custody of the sheriff. His process, whether mesne or final, has affected only the rights which were litigant in the common law court; and those rights, whatever they were, are necessarily subordinate to those which give the admiralty its jurisdiction. He retains all his rights, notwithstanding the marshal's intervention. If he holds an execution, he may go on with his sale; and his vendee will succeed to whatever title belonged to the defendant. The proceedings against the vessel, the thing, the subject of the property or title, may still go on in the admiralty: the sheriff's vendee of the ship may intervene there, as the defendant might have done in this court; he may make defence to the proceeding there, as the successor to the defendant's rights; and may be substituted ultimately before the judge of admiralty, as a claimant of the surplus fund. Or, if the sheriff have not sold before the proceedings in admiralty are consummated, the sheriff may perhaps arrest the surplus proceedings in the admiralty, as was done in the case cited from 1 Hagg. Adm.

On the other hand; to deny to the admiralty the right of proceeding, because proceedings are pending elsewhere that affect the title of the ship, or rights under the title, would be effectively to take from this court its characteristic and most wholesome office. The acts of congress, following in this the maritime policy of the rest of the world, give summary redress in cases of subtraction of wages. Within three weeks, at furthest, from the exhibition of a libel in the admiralty, the seaman has his decree; and in one week more, decree or no decree, he has probably sailed on another voyage. To turn him over to a state court, to await there the protracted determination of a common law suit, to which he is not a party, and of which he knows nothing, would be little else than to deny him justice altogether. It was well said by Lord Stowell, in a suit in personam for wages, against an asserted owner, when called upon by the defendant not to decide the question of ownership, inasmuch as that question was already under adjudication in the high court of chancery. "Shall I put him off to the distant day when these conflicting interests may, after the diligence which the judge of that court himself uses, or compels parties to use, finally be arranged? The obstacles may outlive the

suitor." The St. Johan, 1 Hagg. Adm. 341.

Besides, may it not be questioned whether the state courts could regard the seaman's claim? Suppose the foreign attachment dissolved by the entry of bail, what becomes of the seaman's lien? the bail, whether for the defendant's appearance, or for the satisfaction of the judgment, is liable to the plaintiff only, and for only his asserted demand in the suit. The bail could not be charged for seaman's wages or other maritime liabilities of the thing attached: "non hæc in fædera." Or, suppose the attachment not to be dissolved, but the cause to be prosecuted to final judgment, and a sale made under the execution: what will that execution affect? It was against the defendant, not the ship; and a sale under it can pass no more and no better title than the defendant had. The proceeds of the sale take the place of his residuary interest in the thing sold, and are not liable for the liens which were paramount to his title. How then can the seaman assert his privilege against the proceeds of an execution in a common law suit?

View the subject as we may; while we admit the inconvenience or at least the delicacy, which attends the exercise of a divided jurisdiction, there can be no doubt as to the relative inconvenience of asserting, or of waiving such a jurisdiction as the admiralty has over a case like this. But how can I waive it, were I so inclined? The powers of the court are the property of the suitor; and the judge is nothing but the trustee, whom the constitution and the law have constituted 'to exercise them when the occasion requires.

I may add in conclusion, that the question which this case presents is by no means similar to those which were before the court in the cases cited by the counsel for the attaching creditors, (Mr. Meredith.) Prince v. Bartlett. in 8 Cranch [12 U. S.] 431; Hogan v. Lucas, in 10 Pet. [35 U. S.] 400; and Beaston v. Farmers' Bank, in 12 Pet. [37 U. S.] 102, were all of them cases in which the subject of execution was the same in both courts whose process was in question, and where the same law would determine the distribution of the proceeds, and with equal security to the rights of all parties. A similar remark may be made upon the case of the Robert Fulton [Case No. 11,890], which at first view might seem to conflict with some of the conclusions to which I have arrived. It was the case of a libel for materials against a domestic ship in the admiralty, while a similar libel, also for materials, was pending against the same ship in a state court. Both courts derived their jurisdiction from the same local law; and the circuit court of the United States yielded up jurisdiction to the state court as the tribunal first taking possession of the thing. The ground of the decision is thus expressed by Judge Thompson: "The proceedings were in rem; and the sentence must act upon the thing itself, and could not be executed unless possession of the thing was taken. It is the necessary result, he adds, of proceedings in rem, that the thing must be in the possession of the court;" and he justly concludes that this possession must of course be exclusive. Thus stating the case before Judge Thompson, I need not spend time in distinguishing it from that now before this court.[1]

No one can be more anxiously sensitive than I am to the duty of avoiding a contest of jurisdiction between a court of the United States and a state court; and certainly there is no one, who can regard with more deferential respect the court under whose process the sheriff is understood to be acting, or who can be more fully assured of the safety of every interest which may be confided to its judicial administration. But I see no possibility of collision here; and I am not aware that justice can possibly be done to the parties who are now before me in this court, unless the jurisdiction of this court is maintained.

Inasmuch, therefore, as it appears to the court, that the British barque Royal Saxon, now under arrest and in the custody of the marshal of the United States, is in a perishing condition, and that there are no means of effecting her discharge; it is upon the petition of the master of the said vessel, sanctioned and approved by the consular representative of her Britannic majesty, ordered: That the said vessel, her tackle, apparel, and furniture, be sold by the marshal of the United States for the Eastern district of Pennsylvania, to the highest and best bidder; the said marshal giving at least seven days' notice, by hand-bills publicly posted and by advertisement in daily newspapers, and in the Legal Intelligencer, a weekly paper, of the time and place of such sale; and that he bring the proceeds thereof into the registry of this court, to abide further order and decree.

In pursuance of this decree, the barque Royal Saxon was sold on the 22d of February, 1848, to Robert Taylor. The parties to the foreign attachment in the state court, had, however, in the meantime, proceeded in their suits and obtained an order of sale of the vessel therein as a perishable commodity, under the act of 13th June, 1836: and she was accordingly sold on the 21st of February, 1846, to a firm of the name of Ward & Co. The latter thereupon brought an action of replevin against Taylor, the marshal's

---

[1] It would be a mistake of definition to include foreign attachments and replevins in the same category with admiralty proceedings in rem. The court of admiralty proceeds in rem, because its suitor has the jus in re. whether it be a privilegium or other modification of ownership: its writ, in such case, is irrespective of the person: the thing is defendant. The common law suitor, on the other hand, has only the jus ad rem, a right of recourse against the thing. not of property in it; and according to the civil law, from which these terms are derived, his proceeding is in personam, even when it begins by arresting the defendant's goods, and is followed by a sale of them. See Bonjean, Tr. Act, § 274, &c. The missio in possessionem bonorum. which resembled the English writs of attachment more than any other process of the civil law, was never counted among proceedings in rem: it was applicable to personal and mixed actions only.

vendee, under which the Royal Saxon was taken from his possession by the sheriff and delivered to them.

This replevin of Ward & Co. came on subsequently to be tried at nisi prius before Judge Woodward, of the supreme court of Pennsylvania. [See Case No. 13,803.]