Ranney, J.,
delivered the opinion of the court.
On the 20th of July, 1849, the plaintiff filed his claim in the court of common pleas of Wood county, against the steamboat Julius X>. Morton, an enrolled vessel of more than twenty tons burden, then running between the port of Toledo, in this state, and the port of Buffalo, in the State of New York; for labor performed in her construction, under the act of February 26, 1840, “providing for the collection of claims against steamboats and other water-crafts, and authorizing proceedings against the same, by name.” Curwon’s Stat. in force, 503. Upon process duly issued, she was, on the same day, seized and taken 106] into possession by *the defendant, then sheriff of the county; and after judgment against her, and final process issued for her sale, was duly demanded of him by his successor in *107 office. ELe refused to deliver her up, alleging, as the reason, that she had been taken from his possession by the marshal of the United States for the district of Ohio, upon proceedings in admiralty, instituted in the district court, on the 21st of the same month, by John McEacharn, for the recovery of wages claimed, to be due him as first mate of the boat, This fact was set up, and allowed as a perfect defense to the action in the court below, and its sufficiency for that purpose, is the only question for our consideration. It involves considerations of much delicacy and importance, as it concerns a very beneficial remedy, provided by the laws of the state, the exercise of which is supposed to be in conflict with the laws of the federal government, and calculated to induce a conflict between its courts and those of the state. After giving the subject the careful attention it seemed to demand, we are unanimously of opinion the defense was insufficient, and that the court below erred in giving it effect.
Until 1845, the admiralty jurisdiction of the federal courts had never been extended to the waters of the western states. It may contribute to-a' clearer understanding of. the act of Congress of that year, “ extending the jurisdiction of the district courts to certain cases upon the lakes and navigable waters connecting the same,” as well as the water-craft law of the state, and the necessity of its enactment, to allude briefly to the course of opinion and judicial decision before and since that time. In the 2d section of of the 3d article of the constitution of the United States, it is declared that “ the judicial power shall extend to all cases of admiralty and maritime jurisdiction.” For more than half a century, this language was supposed to describe a class of cases over which the British court of admiralty had jurisdiction, at the time, and before, the revolution. What these were in the main, has never been doubted. Aside from its power over captures, and questions of prize arising jure belli, its cognizance *of contracts was [107 confined to seamen’s wages, bottomry bonds, and contracts made and to be executed on the high seas; and of torts and offenses done and committed on the high seas, and without the limits of any organized county — the one depending on locality, and the other the nature of the contract; and both arising beyond the-jurisdiction of the common-law courts. The- assertion of more extended powers, led to the passage of the memorable statutes of the 13th and 15th Richard II.; by the first of which, it was de *108 dared that the admiralty must “ not meddle, henceforth, of anything done within the realm, but only of a thing done upon the sea;” and, by the last, it was still more specifically ordered, that of “ things done within the bodies of counties, by land or water, the admiral shall have no cognizance, but they shall be tried by tbe law of the land.”
It was evidently with this view of the extent of the jurisdiction conferred upon the federal courts, that the celebrated authors of the Federalist, while the constitution was pending, before the states for ratification, affirmed that “ the most bigoted idolizers of state authority had not thus far shown a disposition to^deny the national judiciary the cognizance of maritime causes. These so generally depend on the law of nations, and so commonly affect the rights of foreigners, that they fall within the considerations which are relative to the public peace.” And so C. J. Jay, in Chisholm v. Georgia, 2 Dali. 419, in giving a comprehensive summary of the judicial powers conferred upon the Union, says: It extends “to all cases of admiralty and maritime jurisdiction; because, as the seas are the joint property of nations, whose rights and privileges relative thereto, are regulated by the law of nations and treaties, such cases necessarily belong to national jurisdiction.” Chancellor Kent, in the last edition of his Commentaries (vol. 1, p. 372), after stating that it is not in the power of Congress to enlarge the jurisdiction beyond what was understood and intended by it, when the constitution was adopted, says: he “ apprehends it may be fairly doubted, 108] whether the constitution of the United States meant *by admiralty and maritime jurisdiction, anything more than that jurisdiction which was settled, and in practice, in this country under the English jurisprudence, when the constitution was made.”
For these reasons, so eminently proper did it seem to be, that the power should be conferred upon the Union, that almost the only remark it elicited in the federal convention, came from a highly intelligent member from Pennsylvania (Mr. Wilson), who said: “ The admiralty jurisdiction ought to be given wholly to the national government, as it related to cases not within the jurisdiction of particular states, and to a scene in which controversies with foreigners would be most likely to happen.” Madison Papers, 799.
The same views' evidently controlled the early decisions of the Supreme Court of the United States. In the case of the steamboat Thomas Jefferson, 10 Wheat. 428, the claim was for wages earned *109 on a voyage from a point in Kentucky, up the Missouri river and back again. The district and circuit courts dismissed the libel, and the Supreme Court affirmed the decree, holding that the admiralty had no jurisdiction over contracts for the hire of seamen, when the service was not substantially performed upon the sea, or upon water within the ebb and flow of the tide. And in the steamboat Orleans v. Phœbus, 11 Pet. 175, it was held that the jurisdiction of courts of admiralty over contracts is limited to those, and those only, which are maritime; and that they had no jurisdiction over a vessel, although one terminus of her voyage might be in tidewater, if she was substantially employed in other waters. That the true test of jurisdiction is, whether the vessel is engaged, substantially, in maritime navigation, or in interior navigation and trade, not on tide-waters.
But in Waring v. Clark (5 How. 441), decided in 1847, a majority of the court, for the first time in direct terms, repudiated the idea that the grant in the constitution is to be construed as limiting the courts of the Union to such cases only as were entertained by the British court of admiralty, and held, that the jurisdiction is neither to be limited to, nor to *be interpreted by, what were cases [109 of admiralty jurisdiction in England when the constitution was adopted by the states of the Union. The case was one of collision, occurring some two hundred miles up the Mississippi river, within the limits of a county, and in the heart of the State of Louisiana. The jurisdiction was maintained, although it was admitted it would not have been in England; upon the ground that it would have been there, at the common law, before the statutes of Richard, and because the vice-admiralty courts in the colonies had exercised an equally extensive jurisdiction before the revolution. It was still, however, confined to tide-waters, navigable from the ocean; and a volume of testimony was taken to show that the river at this point was slightly influenced by the tide.
Mr. Justice Woodbury delivered a very elaborate dissenting opinion, in which Justices Daniel and Grier concurred. After stating that “the controversy was not in England, and is not here, a mere struggle between salt and fresh water, sea and lake, tide and ordinary current, within a county and without, as a technical matter only,” he proceeds to show that it involved three great principles: “ 1. The abolition of the trial by jury over large tracts of country; 2. The substitution there of the civil law and its *110 forms for the common law and statutes of the states; 3. And the encroachment widely on the tribunals of the state over disputes happening there between its own citizens.”
Justice Catron, although concurring in the decision, did so upon the ground that the proceeding was in rem to enforce a lien upon the boat, which the common-law courts were incompetent to do; and stated that he did “ not intend te be committed to any views beyond those arising on the precise case before the court.”
Another step, confessedly beyond the limits of the English admiralty, was taken in the case of the New Jersey Steam Navigation Company v. Merchants’ Bank, 6 How. 344, where a contract for the carriage of specie from New York to Boston, and lost in Long 110] Island Sound, was enforced in the admiralty, ^although the contract was made in the city of New York, and to be performed in the city of Boston. Justice Daniel dissented, and his opinion, as well as that of Justice Woodbury, in Waring v. Clark, contains a very able exposition of the views of those in favor of a more limited construction of the constitutional grant. Before these two decisions were made, and with the unanimous opinion of the Supreme Court twice expressed that the jurisdiction in admiralty was confined to causes arising upon the high seas, or at least on tidewater, the act of 1845 was passed. Judge Story, however, in the case of the Thomas Jefferson, had intimated the opinion that Congress might, under the power to regulate commerce between the states, extend the.summary process of the admiralty to cases arising on the western waters. While it is by no means clear what power conferred by the constitution Congress supposed they were invoking, it looks very much as though this act was the result of that suggestion. It does not in terms confer admiralty jurisdiction; but it is an act to extend the jurisdiction of the district courts to “ certain cases ” arising upon the lakes and navigable waters connecting them, which are to be proceeded in and decided in the same manner as cases arising upon the high seas and tidewaters “within the admiralty and maritime jurisdiction of the United States.” That it was, by Congress, referred to the power to regulate commerce is assumed by Justice Woodbury, in Waring v. Clark, and by Mr. Webster in his argument, in the case of the Steam Navigation Company, in which he represents Congress as “shivering and trembling” under the decision in the Thomas *111 Jefferson, and for that reason “ pitched the power upon a wrong location.”
But in the case of the Genesee Chief v. Fitshugh, 12 How. 443, it was held that the act did not rest upon that power; and Oh. J. Taney very conclusively shows that if it did “ it would be unconstitutional, and could confer no authority on the district courts.” It was, however, sustained upon the admiralty power, which was decided not to be limited to tide-waters, but to extend to all public navigable lakes and rivers *where commerce is carried on [111 between different states, or with a foreign nation. “ If the water was navigable, it was deemed to be public; and if public, was regarded as within the legitimate scope of the admiralty jurisdiction conferred by the constitution.” Justice Daniel again dissented, regarding it as an unwarrantable extension of the powers of the federal government, not by an amendment of the constitution, “but according to the opinions of the judiciary entertained upon their views of expediency and necessity.”
It is thus made very evident, that this jurisdiction is not now whát it was in England when the constitution was adopted; it is not what it was supposed to be by eminent statesmen and jurists of that period; nor what the Supreme Court of the United States for many years held it to be. It has been extended to a large class of contracts made and to be executed upon land, and within the limits of the states; to torts committed infra corpus commitatus; first upon tide-waters, and finally upon any navigable waters, whether connected with foreign commerce or not. The courts exercising this jurisdiction are no longer subjected to the restraints of the common-law tribunals, or impeded by prohibitions from rhem; but, on the contrary, we are now urged to annul the common-law and statutory remedies of the state, and to surrender property Held by its process, whenever and as often as it shall be demanded by the inferior courts of the United States. The question assumes an importance, and th'e necessity of a clear and definite boundary to this jurisdiction is much more imperatively demanded here than in any other country. An extension of it involves not only an encroachment upon those great safeguards of liberty and property — proceedings according to the course of the common law, and the jury trial — but necessarily, in the language of Justice Woodbury, “an encroachment widely on the tribunals of the states.” It is not simply a distribution of judicial power amongst different courts of the same sover *112, 113 eignty, but involves an encroachment by a government of limited powers upon the rights of other sovereignties.
112] *While all will admit that there is “ nothing in the ebb and flow of the tide that makes the waters peculiarly suitable for admiralty jurisdiction,” and that very strong reasons can be given in favor of national jurisdiction over those large bodies of fresh water which separate us from a foreign government, still, with the highest respect for the eminent jurist who delivered the opinion in the case of the Genesee Chief, some may continue to doubt (and I confess myself of the number) whether, if it had been understood when the constitution was adopted to extend to all the internal navigable waters of the country, subjecting suitors to be drawn from the local tribunals to great distances for the settlement of their controversies, and in last resort to the seat of the federal government, it could have been truthfully asserted that it had met no opposition; and whether embarking the general government in such extensive internal administration, over causes civil and criminal, is not to some extent a departure from the great objects for which it was created, and calculated to embroil it in collisions and controversies with the states injurious to the peace and security of both.
Assuming, however, as we do, the ultimate settlement of the extent of this jurisdiction to be correct, or at least decisive of the right of the district court to entertain the proceedings upon which this boat was taken from the sheriff, the consequences now claimed to follow have as yet received no countenance whatever from the Supreme Court of the United States or any state tribunal. These consequences are said to be: 1. That the jurisdiction in admiralty cases is exclusive in the district courts of the United States, and that all state laws conferring jurisdiction upon the state courts over causes that might be prosecuted in admiralty, and vessels that might be seized there, are repugnant to the constitution and laws of the United States, and void; but, 2. If they are not void, vessels taken into custody under process from the state courts may be lawfully taken from the officers of the law, upon proceedings instituted in admiralty for the recovery of seamen’s wages. So far as the first of 113] *these positions is concerned, as well as the further objection to the water-craft law, that it provides for no notice to the owner, they have been settled by this court in the case of Thompson v. The Steamboat Morton (2 Ohio St. 26), in favor of the validity of the law.
This law provides that steamboats and other water-crafts, navi *114 gating the waters within or bordering upon this state, shall be liable for debts contracted on account thereof, for materials, supplies, or labor, in the building, repairing, furnishing, or equipping the same, or due for wharfage; and also for damages, arising out of any contract, for the transportation of goods or persons; for injuries done to persons or property by the craft; and for injuries done by the captain or 'mate to any passenger or hand, on the craft, at the time the injury is inflicted. For any of these causes' of action, proceedings may be instituted against the craft itself which is seized by the sheriff, and, unless released upon bond, is hold in custody by him until final judgment; when, if judgment is against the craft, it may be sold upon execution to satisfy the demand. In the ease of Jones v. The Commerce, 14 Ohio, 408, it was held that the statute only established the liability of the craft, but fixed no lien upon it prior to' its seizure, and that claims against it were to be satisfied in the order of actual seizure by warrant. And, in that case, and the case of the Steamboat Waverly v. Clements, 14 Ohio, 28, it was further settled, that a purchaser of the craft, with notice of a debt or liability created or incurred on account of it by the original owner, takes it subject to such debt or liability; but that a judicial sale vests in the purchaser the title, divested of all liability to be again proceeded against, under the statute, for a claim existing at the time of sale. In Lewis v. Cleveland, 12 Ohio, 341, the act was held to extend to the recovery of seamen’s wages; and in Kellogg v. Brennan, 14 Ohio, 72, and Prevost v. Wilcox, 17 Ohio, 359, it was determined that the debts and liabilities of the craft, arising under this act, covered the interest of a mortgagee, and were to be preferred in the distribution of the proceeds *of the sale, to the mortgage money; especially, as [114 it appeared the boat was run for the joint interest of the mortgagee and owner. But it has never been hold that specific liens upon the craft, existing before the seizure, and independently of the statute, would not bo respected and upheld. It can not be for a moment doubted, that all such-liens founded, on causes of action, whether falling within the act or not, as by law are made superior to the debt or liability for which the craft is seized, would be preferred in the distribution of the proceeds of sale upon proper application made to the court for that purpose.
This statute, then, as stated by the court in The Huron v. Simmons, 10 Ohio, 461, “treats the boat as a person, and makes it *115 responsible, in its own name, for all debts contracted for its use, and for all injuries committed against persons or property on board, by her officers or crew.” The liability is upon the craft — ■ the proceeding is against the craft — and the judgment operates alone upon the craft. Its seizure is indispensable to the jurisdiction of the court, and its continued custody, unless released upon bond and security, indispensably necessary to the further proceedings, after final judgment.
The proceeding, therefore, is strictly and technically in rem: it is pursued without reference to the owner, to enforce a liability which the thing itself has incurred, and the thing itself is condemned to make reparation. Possession is the essential element upon which the jurisdiction of the court depends; and as this possession is deemed that of the sovereignty under whose authority the court sits, if any question can be regarded as settled by the unanimous opinion of courts and jurists, it is this — that “the law regards the seizure of the thing as constructive notiee to the whole world.” Hollingsworth v. Barber, 4 Pet. 475. Other means for giving notice may be provided at the discretion of the sovereign power, upon the observance of which, the jurisdiction may, or may not, depend; but where they are not prescribed, the power of the 115] court over the thing when taken into the custody of *the law, is perfect and complete, and the final disposition of it binding upon the world. As the subject of liability and’ seizure described in this statute, are so uniformly attended by the.owner or master representing all interests, the legislature has regarded the seizure and taking the thing into custody, as effectual notice to those interested of the pendency of the proceedings, and has, therefore, provided for no other.
If, then, the state government had the power to give authority to her courts to entertain jurisdiction of the causes of action specified in this statute, and to enforce them in rem, it has been effectually done. Jurisdiction over the boat in this case was lawfully acquired; it was lawfully taken into the custody of the law; and the plaintiff had a right to require the sheriff to keep it in custody until it was lawfully disposed of after final judgment. That the state government had this power is perfectly clear, unless its exercise is inconsistent with the grants of power to the federal government, to be exercised by the courts of the Union. The argument that it is so, proceeds upon the ground that the causes for which the proceeding *116 may be employed are causes of admiralty jurisdiction, to which the judicial power of the United States is extended, and over which exclusive jurisdiction has been conferred by Congress upon the district courts. And this, it is claimed, is conclusive against the jurisdiction of the state court, and demonstrates the illegality of the seizure of the boat in the first instance. But if the state court had jurisdiction, and the original seizure was lawful, it is still insisted it is a jurisdiction to be exercised in subordination to that conferred upon the district court, and can not be permitted to withhold any property liable to seizure upon the process of that court from its action, inasmuch as it is declared in the sixth article of the constitution of the United States, that “ this constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything *in [116 the constitution or law of any state to the contrary notwithstanding.” And it is hence inferred that the provision gives superior efficacy to process issued from the courts of the Union over that of ' the state courts, when exercising a concurrent jurisdiction; and authorizes them to withdraw property taken into custody and held by the latter under state laws; and especially is this said to be warranted upon proceedings instituted to enforce a mariner’s paramount lien for wages.
To the first branch of this argument it is sufficient to reply that Congress (if it has the constitutional power, which I by no means concede) has not attempted to confer exclusive jurisdiction upon the district courts; but on the contrary, has expressly saved the common-law and statutory remedies of the states. By the act of 1845, it is provided that there shall be saved “ to the parties the right of a concurrent remedy at the common law, when it is competent to' give it; and any concurrent remedy which may be given by the state! laws, where such steamer or other vessel is employed in such business of commerce and navigation.” Now, it is quite immaterial whether' the jurisdiction of the district courts over vessels employed in' the navigation of the lakes depends upon this act, or may be supported upon the assumption that the act of 1789 extended to all the internal navigable waters of the country. In either case, Congress has' positively declared that every suitor, at his election, shall have the bonefit of state remedies; and has thus necessarily so far restricted1 *117 the jurisdiction and powers of the district courts as to make this declaration effectual. But without this saving, the jurisdiction of the state courts could not be doubtful. Without turning aside to inquire whether all, or what, of the cases provided for in the state law are such as would be cognizable in admiralty, under the enlarged views now entertained of that jurisdiction, it is undeniable that all of them are such as the original states enforced in their own tribunals,-independent of national authority, before the adoption of the constitution of the United States; and such as they have 117] since Constantly entertained, and in most of those states have enforced under laws, in no material respect different from our own. In such cases the concurrent jurisdiction of the state courts was admitted in Martin v. Hunter’s Lessee, 1 Wheat. 304. As evidence of the prevailing opinion upon this subject, and as fully expressing our own, we copy the following extract from Mr. Justice Story’s Commentaries on the Constitution, vol. 3, p. 534, n. He says: “ It (the admiralty jurisdiction) is exclusive in all matters of prize, for the reason that at common law this jurisdiction is vested in the courts of admiralty, to the exclusion of the courts of common law. But in cases where the jurisdiction of the courts of common law and the admiralty are concurrent (as in cases of jtossessory suits, mariner’s wages, and marine torts), there is nothing in the constitution necessarily tending to the conclusion that the jurisdiction was intended to be exclusive; and there is little ground, upon general reasoning, to contend for it. The reasonable interpretation to the constitution would seem to be that it conferred on the national judiciary the admiralty and maritime jurisdiction,, exactly according to the nature, and extent, and modifications in which it existed in the jurisprudence of the common law. Where the jurisdiction was exclusive, it remained so; where it was concurrent, it remained so. Hence, the states could have no right to create courts of admiralty, as such, or to confer on their own courts the cognizance of such cases ás were exclusively cognizable in admiralty courts. But the states might well retain and exercise the jurisdiction in cases of which the cognizance was previously concurrent in the courts of common law. This latter class of cases can be no more deemed cases of admiralty and maritime jurisdiction than cases of common law jurisdiction.”
Concurring fully in these views, we are brought to the undoubting conclusion that the state had full power to invest- its courts *118, 119 with jurisdiction over the cases described in the water-craft-law, and that the boat, in this instance, was lawfully seized and taken into custody.
*If the state court had rightful jurisdiction over the craft [118 when the proceedings were commenced, could it be lawfully deprived of it during their pendency? A few very obvious considerations, it seems to us, furnish a sufficient answer to the asserted supremacy of the proceedings instituted in the district court.
The constitution of the United States, and the laws made in pursuance thereof, we know, and are happy to acknowledge, are the supreme laws of the land. The mistake consists in supposing them the only supreme laws in the land. Before the constitution of the United States was adopted, the people of the several states were, and still continue to be, the only source and fountain of sovereign authority which our theory of government acknowledges. To secure their happiness and safety, they had constituted governments, and invested them with the exercise of such sovereign authority as they deemed necessary for the purpose. Some of these powers, it was wisely thought, could be best exercised by a government extending over and common to them all. They erected such a government, and clothed it with certain enumerated and clearly-defined powers, drawn, in part, from those previously conferred upon tlio government of the confederation; in part from those in possession of the state governments ; and in part, perhaps, from those until then undelegated. It is, however, entirely immaterial from what quarter they were taken. It is enough that the people were entirely competent to take them from any source they saw proper, and confer them upon the common government they created.
As these powers were to be exercised in the name and by the authority of the sovereign power conferring them, by the consent of all, for the benefit of all, their supremacy over the local institutions of the states necessarily followed, and was very appropriately declared. But, while the people of each state, adopting, or afterward acceding to, that constitution, were thus willing to remove every impediment to the uncontrolled action of the government created by it, within *the prescribed limits, they were not [119 less careful to confine it to -those limits ; and hence, in the 10th amendment, we find it declared, by the same high authority, that “ the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states *120 respectively or to the people.” Each of these provisions is simply declaratory of a result to which a fair construction would have led without it; and neither, therefore, was absolutely necessary; but they were adopted from abundant caution, and evince the great solicitude felt to make, as far as practicable, a clear line of separation between the powers to be exercised by the federal government and the states respectively, and to avoid collisions in their operations, so detrimental to the permanency, stability, and usefulness of each.
The powers conferred upon the federal government, although of commanding importance, fell very far short of the necessities of a complete administration of civil affairs. To meet this necessity it became necessary to leave with, or afterward confer upon, the state governments much more numerous powers, and certainly not less important to the security of life, liberty, and property, than those with which the general government was invested. These powers are derived from the same high source, delegated in the same manner and for the same great object; each springing directly from the people, and resting upon the sure foundation of their sovereignty, is, within its alotted sphere of action, equally supreme and equally armed with ample authority for the execution of the important trusts committed to its care ; each acting through its judicial department, operates directly and alone upon individuals; and each, when acting within its rightful jurisdiction, has supreme control over all the persons and property within the territory covered by its authority. If the courts of each are authorized to entertain jurisdiction over the same class of cases, it then depends upon the election of the suitor which shall be employed ; but let it be the one or the other, so soon as its jurisdiction has attached, 120] by taking either persons or property into its custody, *it is entitled to proceed to final judgment, unmolested by the other. In cases of which the exclusive cognizance is not given to the federal courts, the states have the absolute and uncontrollable right to provide such remedies, either in rem, or in personam, as to them shall seem just and proper, and to authorize their courts, in the exercise of the sovereign authority with which they are invested, to seize upon and take into their custody either persons or property, as the nature of the case may require. If the proceeding is in rem, the" possession taken becomes that of the sovereignty under whose authority it is taken, and is no longer that of the owner. *121 And, as process issued from, the courts of the Union spend its whole force upon individuals, or property in the possession of individuals, it necessarily follows that it falls short of conferring any authority whatever for interfering with the possession thus acquired of a sovereign state. However clearly the line between state and federal powers may be traced, still, as both must operate upon the same persons and property, nothing short of the absolute supremacy of the latter over the former, while each is acting strictly within its constitutional limits, could justify the inference here attempted to be supported.
It is impossible to foresee all the disastrous consequences to which such a principle would lead; but instances will very readily occur. Both governments may lay and collect taxes upon the same property ; but property taken by the state for this purpose may be taken from it by officers of the general governnent. Both may punish the same persons for crime; but persons imprisoned for infractions of state laws must be released to answer proceedings instituted against them in the federal courts. As a general thing, residents of the state can only prosecute their claims in the state courts; but after judgment in their favor, and executions levied upon property for their satisfaction, the property may be taken from the officers of the law, upon judgments in favor of non-residents, subsequently obtained in the federal courts. Thus establishing a practical priority in favor *of non-residents [121 over the citizens of the state. A construction so degrading to the state governments, and so utterly destructive' of their ability to discharge the important functions for which they were instituted, we feel no hesitation in saying, finds no warrant in the language, history, or purposes of the constitution of the United States.
As yet, neither this construction, nor the asserted right of the admiralty courts to seize upon property held by the process of the courts of common law, has received any considerable support from judicial determinations. In the long course of the British admiralty but a single case (The Flora, 1 Hagg. Adm. 298) is found where such interference has been attempted ; and the utmost that has been, or can be, claimed for that case is a tacit recognition of the power arising from the fact that it was not questioned by the counsel for the creditor in the common-law court. But the report gives a very good reason why it was not questioned; and why the creditor preferred a sale by the marshal instead of the sheriff; and, also, in *122 forms us that by an understanding between the parties, the vessel remained in the actual custody and possession of the sheriff’s officer, so that the creditor claimed, and actually obtained the satisfaction of .his execution after the claims preferred in the admiralty court were paid. Under these circumstances, this case, aside from its entire want of applicability to the rights and powers of courts acting under separate and independent sovereignties, can, certainly, be regarded as of very little value.
The only cases decided in this country which have been brought to our notice by the defendant’s counsel, or of which we have any knowledge as favoring, to any extent, his position, are the Spartan, Ware, 147; Certain Logs of Mahogany, 2 Sum. 592, and Wall v. The Royal Saxon, 2 Am. Law Reg. 324.
Neither of these cases furnishes any authority for the action of this court. They were all decided by the inferior courts of the United States, and the positions taken and the reasons assigned 122] are entitled to the same respectful consideration as though they had been advanced at the bar; no more, and no less. As the ease of the Royal Saxon, in the district court for the eastern district of Pennsylvania, was decided last — is the most nearly in point, and is considered with much the most ability — I shall refer, at any length, only to that case. The libel was in admiralty for seaman’s wages and supplies. Before the proceeding was instituted the vessel had been taken into custody upon process issued by the Supreme Court of Pennsylvania, on proceedings in foreign attachment, commenced in that court against her owners. An application being made to the district court for an interlocutory order of sale, the attachment creditors intervened, and insisted that, pending the attachment in the state court, the vessel was not liable to arrest upon the proceedings commenced in the district court, and therefore the order of sale ought not to be made. Judge Kane made the order, notwithstanding the objection, and commences liis opinion by affirming that “ the authority of the courts of admiralty to make seizure and sale of vessels, while under attachment from the courts of common law, has not hitherto been questioned in England or this country.” When it is considered that he is able to refer only to the case of the Flora, in England, and to that of the Spartan, in which it is expressly stated that the regularity of the proceeding was not questioned by the attaching creditors, and to some equivocal dicta in the case cited from Sumner; it must bo deemed a very slender *123 foundation upon which to base so broad an assertion. Indeed, the result of bis own reasoning strips it of its latitude, and confines it to proceedings instituted to enforce a right to, or lien upon, the property paramount to that upon which it is held in the common-law court, and which such court may be incompetent to notice and enforce. He considered the proceeding in attachment as essentially in personam, and the writ as binding only the interest of the defendant in the property, whatever that might be; and, therefore, not extending to the paramount lien or interest of the seamen for their wages, which he compares to the title of a third person, not a party *to the proceeding. We need not stop to inquire what [123 weight is due to most of these considerations. The proceeding upon which this boat was held was undeniably in rem. It is as true of this proceeding, as though it had been in admiralty, that “ the subject-matter of the controversy is the res itself. It passes into the custody of the court. All the world are parties, and the decree concludes all outstanding interests, because all are represented.” The court having the boat in custody had full power to recogüize and enforce the seaman’s paramount lien, if he saw fit to ask it, in the same manner and to the same effect as a court of admiralty. What more could the district court have done? If tho material man had seen fit to commence his proceedings in that court (as he might have done), and the seaman had commenced his in the state court (as he also might' have done), would it have authorized the sheriff to have taken the boat from the custody of the marshal? It certainly would, if the right depends upon the paramount lien; but I presume such an application of the doctrine would be at once repudiated. If the proceeding of the material man had been instituted in the district court, it would have compelled the seaman to present his claim there before the proceeds of the sale were distributed, or lose his lien upon it.
What greater hardship in requiring him to do the same thing when the former was rightfully and legally proceeding in the state court? The state had the right to provide this remedy for both the claims. She had done so; and Congress had provided that the suitor, at his election, might pursue-it. Did that body, after giving the right, intend that it should be defeated by the interference of their own courts, invested with concurrent jurisdiction, which owed their existence, and all the powers they possessed, to their sole authority?
*124, 125 The suitor was not a tenant at will in the state court. He had a perfect right, either with or without the saving in the act of Congress, to proceed there; and having elected to do so, there was no higher law, and no sovereignty more sovereign, than that he was 124] invoking to defeat the jurisdiction *the court had acquired. The whole argument in favor of such interference is founded on a mistake. It is very true that the property of A can not be taken for the debt of B. Constitutional guaranties make the government as incompetent to do this as the humblest individual. But the seaman has no such property in or title to the vessel on which his wages are earned. He has a highly favored claim, which gives him a privileged lien upon the vessel and its proceeds, with the right to have it converted into money for his payment. He could not sustain an action of replevin, founded upon an assertion of title or ownership to recover the possession from the owner, much less when the possession of the owner has passed into the custody of the law, and the vessel is in process of being converted into money by a court, with perfect ability to secure him all his just rights, can he be permitted to defeat other creditors equally meritorious by interfering with the possession upon which its jurisdiction depends. Such a course would not only be without right, but without excuse.
This view of the subject is rendered nearly conclusive by authorities which we are bound to respect. Dawson v. Holcomb, 1 Ohio, 275, was a motion to amerce a sheriff for failing to pay over money made on execution. He answered that it had been attached in his hands as the property of the judgment creditor. The court held the defense insufficient, and say: “While the money remains in the hands of the officer, it is in the custody of the law. It does not become the property of the judgment creditor till it is paid over, and consequently it is not liable to be attached as his. The writ of attachment could not supersede the execution, or release the sheriff from a literal compliance with its command, which required him to bring the money into court, so that it might be subject to their order.”
This case was decided upon the settled common-law principle that property in the custody of the law is not subject to seizure upon legal process. The doctrine is placed upon still broader 125] grounds by the Supreme Court of the United ^States, in its application to the respective action of the state and federal courts. *126 Judge Story, in his Commentaries on the Constitution (vol. 3, sec. 1751), lays down the general proposition that, “ in the exercise of the jurisdiction confided respectively to the state courts, and those courts of the United States (where the latter have not appellate jurisdiction), it is plain that neither can have any right to interfere with or control the operations of the other.” The same principle is still more pointedly stated by Justice McLean in Prigg v. Pennsylvania, 16 Pet. 663. He says: “The powers which belong to a state are exercised independently. In its sphere of sovereignty, it stands on an equality with the federal government, and is not subject to its control. It would be as dangerous as humiliating to the rights of a state to h'old that its legislative powers were exercised to any extent, and under any circumstances, subject to the paramount action of Congress. Such a doctrine would lead to serious and dangerous conflicts of power.” In Hogan v. Lucas, 10 Pet. 400, the property was first levied upon by the sheriff, and after being delivered to a claimant upon a forthcoming bond, was seized in execution by the marshal. The court say: “Had the property remained in the possession of the sheriff, under the first levy, it is clear the marshal could not have taken it in execution, for the property could not be subject to two jurisdictions at the same time. The first levy, whether it were made under the federal or state authority, withdraws the property from the reach of the process of the other.
“ A most injudicious conflict of jurisdiction would be likely often to arise between the federal and state courts, if the final process of the one could be levied on property which had been taken by the process of the other.
“No such case can exist; property once levied on, remains in the custody of the law, and it is not liable to be taken by another execution in the hands of a different officer, and especially by an officer acting under a different jurisdiction.”
*In Peck v. Jenness, 7 How. 612, the property was attached [126 upon mesne process, under the laws of New Hampshire. Pending the proceedings, the defendants became bankrupt, and were regularly discharged from their debts by the district court. On the petition of the assignee, that court decreed that this attachment was not a lien on the property in the custody of the sheriff, and ordered him to deliver it up to the assignee, or to account to him for its value.
*127 The question was, whether this was a sufficient defense to further proceedings in the state court. The court, affirming the judgment of the superior court of the state, held it was not; and, after adverting to the fact that tlic state court was an independent tribunal, not deriving its authority from the same sovereign, and, as regards the district court, a foreign forum, in every way its equal, uses this emphatic language:
“ It is.a doctrine too long established to require the citation of authorities, that where the jurisdiction of the court, and the right of the plaintiff to prosecute his suit in it, have once attached, that right can not be arrested or taken away by proceedings in another court. These rules have their foundation not merely in comity, but necessity. Eor, if one may enjoin, the other may retort by injunction, and thus the parties be without remedy. Neither can one take property from the custody of the other, by replevin or any other process, for this would produce a conflict extremely embarrassing to the administration of justice.” ■
To the same purpose, and no less explicit, is the opinion of Mr. Justice Thompson, in the case of the Robert Eulton, 1 Paine, 620. In that case, the ship was seized and taken into custody by the sheriff, at’ the suit of certain material men, upon jn’oeess issuing from a state court, under a statute very similar to the law of this state. "While so in custody, other material men instituted proceedings in the district court, under which she was taken from the sheriff by the marshal. The 'judge says :
“ If the sheriff by virtue of his warrant had attached and taken into his possession the ship on the 10th of May, as he has returned, 127] it is in no way explained how the marshal *could, the day after, seize and take into his possession the same vessel, and proceed to sell the same, under-the orders of the district court. The •right and authority of the sheriff under the process directed to him to attach the vessel, can not be questioned, and if he had so done, the shijD was in the custody of the law, and the mai’shal could have had no authority to take it out of the possession of the sheriff. If he found the vessel held by the sheriff under his attachment, he should have so returned to the district court upon his process, and all further proceedings of the district court would have been arrested, and no conflict of jurisdiction could have arisen. The proceedings were in rem, and the sentence of the court must act on the thing itself and could not be executed, unless possession *128 of it was taken. It is the necessary result of proceedings in rem, that the thing in litigation must be placed in the custody of the law. It must be in the possession or under the control of the court. And the right to maintain the jurisdiction must attach to that tribunal which first exercises it and takes possession of the thing in litigation. This course is indispensable in order to avoid a clashing of jurisdictions.”
To these cases in the federal courts, establishing principles which, we think, must control the one at bar, we should not omit to add the case of Carryl v. Taylor, 2 Am. Law. Reg. 333, decided by the Supreme Court of Pennsylvania, sitting at nisi prius.
The action was replevin, and the suit was brought to recover possession of the barque Royal Saxon — the subject of controversy in the district court, in the case to which I have referred. The plaintiff was the purchaser under the proceedings in attachment in the state court, and the defendant under those of the district court.
The jurisdiction of the state court, and its right to retain the possession of the vessel against the process of the district court, as well as the title of the plaintiff, were fully sustained in a very able opinion by Mr. Justice Woodward, to which I can not do more than refer, and express the concurrence of this court in its reasonings- and conclusions.
*1 have thus, at much greater length than I had intended, [128 stated the reasons and authorities upon which we rely in coming to the conclusion, that the defendant was wholly unjustified in surrendering the boat in his custody to the marshal.
We regret the necessity that compels us to affirm his liability, as he probably acted under a mistake as to his duty. But he was bound to know his duty; and whether mistaken or not, the plaintiff lost his debt by his failure to perform it, and we have no right to deny him a remedy. The sooner ministerial officers understand, "the better it will be for them, that the law places at their disposal, the force necessary to enable them to execute process in their hands, according to its command; and that they always act safely when they act under the direction of the court from which it issues, and never without it.
But if we could deny this plaintiff a remedy, we should still have no right (and as little inclination) to diminish the power of *129 the state, to discharge one of the most sacred of its obligations by-doing justice to the suitors in its courts.
How little this very beneficial statute would be worth, if we yielded to this interference, is illustrated by this case. The record informs us, that the marshal, at the request of the parties, removed the boat from the county into Lake Erie, when the claim of the seaman was settled, and the boat delivered to the master; who never afterward suffered it to come within the limits of the county of Wood. There can be very little doubt, that the process of the district court was used, for the mere purpose of withdrawing the boat from the reach of the creditor in the state court. If so, what was true in this case, will be true in every other, at the election of the master or owner; as a seaman may always be found, with a claim real or pretended, upon which to obtain the process. We must hear better reasons than we have yet heard, or can imagine, before we consent, thus to place an honest creditor in our courts at the mercy of his debtor.
The judgment of the court of common pleas is reversed, and the cause remanded for further proceedings.